MURPHY and another, Respondents, vs. SAGOLA LUMBER COMPANY, Appellant.

*May 6—June 23, 1905.*

*Sales: Place of delivery: When title passes: Breach of contract.*

1. Under a contract for the purchase of lumber f. o. b. cars at the point of shipment, the place of delivery is the point of shipment, and when the lumber is put on the cars at that point the title passes to the purchaser, and the lumber is thereafter at the purchaser's risk, if it corresponds in quality with the specifications of the contract.

2. Plaintiffs, manufacturers at Green Bay, Wisconsin, contracted with defendant to pay for lumber f. o. b. cars Sagola, Michigan. *Held*, that the amount of lumber to be paid for was the amount put upon the cars at Sagola (provided it conformed to the contract); and while plaintiffs might tally the lumber at Green Bay on its arrival, and this tally would be some proof of the amount loaded at Sagola, when plaintiffs took the position that they would only pay for the amount received at Green Bay, it was a breach of the contract on plaintiffs' part.

3. In such case the defendant had a right to refuse to further execute the contract on its part.

4. In such case the rights of the parties were not affected by defendant's unaccepted offer to deliver at Green Bay on condition of advance payment for the balance of the lumber.

APPEAL from a judgment of the circuit court for Brown county: SAMUEL D. HASTINGS, Circuit Judge. *Reversed.*

This is an action for the breach of a contract for the sale and delivery of a quantity of lumber. The plaintiffs are box manufacturers doing business at Green Bay, and the defendant is a corporation manufacturing lumber at Sagola, Michigan. On the 4th of September, 1902, the parties entered into the following written contract:

"GREEN BAY, Wisconsin, September 4, 1902.
*"Sagola Lumber Company, Sagola, Mich.*

"GENTLEMEN: We agree to pay to the *Sagola Lumber Company,* $10.00 per M. for one million feet of No. 4 Boards, F. O. B. Sagola, same grade and thickness as we have been

getting in the past, to be no inferior in any way, and to be shipped as ordered when in shipping condition.   We to advance the *Sagola Lumber Company* $5,000.00 to hold said lumber until we are ready to have same forwarded to us.    It is also understood that three quarters of this lumber is dry, or will be at the time it is wanted.   The above purchase is to hold good with the understanding we are able to get a rate of $7\frac{1}{2}$c. or stop-over rate that will not exceed $7\frac{1}{2}$c.

> "Murphy Box Company.
> "E. N. Murphy, Mgr.

"We accept the above.

> "Sagola Lumber Company.
> "John O'Callaghan, President."

The plaintiffs secured the seven and one-half cent freight rate referred to in the contract and advanced to the defendant $5,000, as provided for in the contract, and the defendant commenced shipping the lumber in carloads lots as ordered.   The shipping continued through the fall and early winter; the defendant tallying the lumber at Sagola and sending invoices with each shipment.   The plaintiffs tallied the lumber as it arrived at Green Bay, and November 29, 1902, they notified the defendant by letter that one car, shipped November 18, 1902, was short 480 feet.   The defendant replied to this letter to the effect that:

"If we can't agree on tally you had better send a man here to tally out a lot with our man.   We will get mixed up unnecessarily unless we keep it smooth as we go along."

No answer appears to have been returned to this letter, but on December 9th the plaintiffs wrote the defendant, asking why lumber was not being shipped, and demanded shipments as fast as possible.   The defendant replied December 10th, promising shipments right along.   It appears that further shipments were then made as before, and that on January 12th the defendant had shipped more than half the lumber contracted for, and then wrote a letter asking for a $5,000 check for the last half of the lumber.   This was re-

fused by the plaintiffs, and they stated that they would pay for the balance as received. Other correspondence followed on this subject, and on January 23d the plaintiffs sent a voucher to the defendant, stating the amount of the lumber received by them up to date, deducting the alleged 480 feet shortage, and inclosed check for $366.79, as the balance due over and above the advance payment of $5,000. No shipments had been made since January 10, 1903, and on February 18, 1903, the plaintiffs wrote, asking to have the balance of the lumber shipped. On the following day the defendant replied as follows:

"We have your favor of the 18th advising us to ship lumber, but in the last remittance you deducted $4.80, and if there is going to be any differences of that kind, better arrange to have tally corrected here at Sagola."

To this letter the plaintiffs replied on the following day:

"You seem to kick on the $4.80 deducted from our last remittance. If you will look up our letter of November 29th, you will see the reason why it was taken off, and think we were justified in doing so. We hardly think it is necessary to send a man up to Sagola to see if tally is correct, as all other cars shipped down here seemed to be all right.

"Kindly let us know at once whether or not you intend shipping us this lumber; if not, we shall order this lumber elsewhere."

The defendant, on receiving this letter, replied as follows:

"Replying to your favor of the 20th we do not feel obliged to ship you the lumber, unless you agree very definitely, that you will accept inspection and tally on board cars at Sagola, as final, or send us $5,000 and we will ship it in same as last half million."

The plaintiffs replied:

"You know as well as we do that any man is liable to make a mistake, and as you well know, we found one in one of your cars which amounted between two or three thousand feet, and you want us to accept a car of this kind.

"Therefore, for the last time, we will say, that we will not send you $5,000 and shall expect you to ship the balance of this lumber at once, otherwise we will see whether or not you are obliged to ship it."

Shipments of lumber ceased January 10, 1903. Further correspondence followed the last letter quoted; the defendant insisting on a $5,000 payment and the plaintiffs refusing to make it. On the 26th of February, 1903, the plaintiffs purchased 600,000 feet of lumber at Menominee, Michigan, at $13.25 per M., and claimed as their damages the difference between the amount so paid and the contract price upon the balance of the lumber to be delivered on the contract. A special verdict was returned by the jury to the effect: (1) The market value of lumber of the quality named in the contract during January, February, and March, 1903, was $11 per M. (2) There is a custom, on sales of lumber of this kind, where a controversy arises over the scaling of shipments, for seller and purchaser to agree upon an independent scaler, or scaler to scale the lumber at the place of shipment, whose scale shall be conclusive. (3) There was a shortage on the car shipped November 18, 1902.

The trial judge, upon motion, changed the answer to the first question of the special verdict to $13.25 per M., and entered judgment for the plaintiffs for the amount of their damages on that basis, and the defendant appeals.

For the appellant there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondents there was a brief by *Greene, Fairchild, North & Parker,* and oral argument by *B. E. Parker.*

WINSLOW, J. The trial court held that the defendant breached the contract by refusing to forward lumber until the plaintiffs forwarded the last half of the consideration. Were there no other facts bearing upon the refusal to forward the lumber we should have no difficulty in agreeing with the

·conclusion, but there are other undisputed facts which seem to us of paramount importance and which demonstrate that the plaintiffs first breached the contract.

The contract was simple and easily understood. It provided for the purchase by the plaintiffs and the delivery by the defendant of 1,000,000 feet of lumber in parcels as or-·dered. The ·lumber was to be put "free on board" cars by defendant at Sagola. This was plainly shipment and delivery by the defendant. When this was done the title passed to the plaintiffs, and the lumber was at their risk if it corresponded in quality with the provisions of the contract, and there is no claim that it did not. The amount of lumber to be paid for was necessarily the amount put upon the cars at Sagola (provided it conformed with the contract), not the amount taken off the cars at Green Bay. Hence, under the terms and necessary implications of the contract, while the plaintiffs might tally the lumber at Green Bay on its arrival, and this tally would be some proof of the amount loaded on the cars at Sagola, they had no right to say that they would only pay for the amount received at Green Bay. If such was the definite position taken by them during the progress of shipments, it was a breach of the contract, for the contract was to pay for the amount put onto the cars at Sagola. We think that the evidence very clearly shows that such was their position and claim. When the shipment of November 18th was received they at once sent back a statement showing that it was 480 feet short, and deducting the shortage from the defendant's credit. The defendant wrote, requesting the plaintiffs to send a man to Sagola to tally out a lot with defendant's man, if there could be no agreement on the tally. To this letter plaintiffs made no reply, but on ·January 23d, following, sent to defendant a voucher for the amount then shipped in excess of the first half million feet, ·deducting the alleged shortage, and required a receipt in full ·of the account before it would be paid. This seems a very

clear indication that the plaintiffs claimed that delivery was
to be made at Green Bay, and that they would only pay for
the amount actually received at that point.     That this was
their position is further evidenced by plaintiffs' letter of Jan-
uary 20th, in which they say they will pay as cars are re-
ceived and unloaded; also by the testimony of one of the
plaintiffs, who said, "We refused to pay for any of the lum-
ber until it was received by us in Green Bay."     Of course,
the plaintiffs had a right to inspect the lumber received at
Green Bay, and reject the same if not in accordance with the
contract.     They also had the right to tally it, and such tally
would be some evidence as to the amount actually delivered
by loading on the cars at Sagola.     But they had no right
to insist that they would only pay for the amount received
at Green Bay, regardless of the amount loaded on cars at
Sagola.     This latter position was clearly the position which
they took.     When this position was definitely taken by the
plaintiffs, late in January, 1903, shipments were suspended
for a time; but it is evident that the plaintiffs did not regard
it as a final suspension, for on the 18th of February they re-
quested the defendant to ship the balance of the lumber.     In
reply to this the defendant again suggested that, if there
were to be differences in the tally, it would be better to have
the tally corrected at Sagola.     The plaintiffs rejected this
suggestion as unnecessary, and the defendant on February
21, 1903, declined to ship unless plaintiffs agreed definitely
to accept inspection and tally at Sagola as final, or advance
$5,000, when they would proceed to ship all.     The defendant
had already submitted to the slight cut which plaintiffs made
on the November shipment by accepting the money sent in
January in full, but we do not regard this act as foreclosing
it from insisting on the proper construction of the contract
as to future shipments.     The ground had been taken by
plaintiffs that the lumber was to be delivered at Green Bay,
and that only the lumber so delivered was to be paid for;

and the defendant, by the letters last quoted, substantially took the ground, which we believe to be the proper one, that under the terms of the contract the lumber was delivered when loaded on cars at Sagola, and must be paid for if of the quality required.

Viewed in the light of all the circumstances, the plaintiffs' letters can only be construed as a demand that the lumber be delivered at Green Bay, and that only lumber so delivered would be paid for, when the contract provided for its delivery at Sagola. This was an announcement that they declined to carry out the contract according to its terms, and the defendant thereupon had the right to refuse to further execute the contract on its part. Nor were the rights of the parties affected by the offer of the defendant to deliver at Green Bay on condition that advance payment be made for the balance of the lumber. This amounted simply to an offer to vary the terms of the contract, which was not accepted by the plaintiffs. The conclusion reached upon this question renders unnecessary any consideration of the custom found by the jury, or of any of the other questions discussed by counsel.

The defendants were entitled to judgment upon the evidence and the verdict, and, the proper motion for judgment having been made in the trial court, there is no necessity for further trial.

*By the Court.*—Judgment reversed, and action remanded with directions to enter judgment for the defendant dismissing the complaint.